IN THE UNITED STATES DISTRICT COURT
FOR NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE FOLLOWING CELLULAR DEVICE CURRENTLY LOCATED AT THE ATF MARTINSBURG FIELD OFFICE IN MARTINSBURG, WEST VIRGINIA:<br><br>APPLE IPHONE 13 WITH CRACKED SCREEN AND CLEAR CASE WITH BLUE FLOWERS | CASE NO.: 3:24-MJ- 100 |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Lauren Scoll, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— an electronic device—which is currently in law enforcement possession and further described in Attachment A, and the extraction from that property of electronically stored information described in Attachment B.

2. I became a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") in March 2005. I had a voluntary break in service in 2013, and I was reinstated in February 2021. I am a graduate of the Criminal Investigator Training Program and ATF's Special Agent Basic Training at the Federal Law Enforcement Training Center in Glynco, Georgia. This included training in the investigative techniques of criminal violations of the Gun Control Act (18 U.S.C ch. 44) and the National Firearms Act (26 U.S.C. ch. 53). Prior to

becoming a Special Agent, I was an investigator for a private investigation firm and an ATF Industry Operations Inspector in California. I have a Bachelor of Arts in Communication Disorders and Sciences from California State University, Northridge.

3. I have conducted covert surveillance of suspected firearms and controlled dangerous substances ("CDS") traffickers, interviewed individuals regarding the firearms/CDS trafficking trade, participated in the execution of numerous state and federal search warrants, and participated in the seizure of numerous firearms and CDS. Through my training, education, and experience, I have become familiar with the manner in which illegal firearms and CDS are obtained, transported, stored, and distributed, and the manner in which firearms and CDS traffickers communicate with each other. Through my training, education, and experience, I have also become familiar with use of firearms in CDS trafficking and usage.

4. Through my training and experience, I have become familiar with the methods of operations typically utilized by individuals who illegally obtain and possess firearms and distribute CDS and possess firearms. I know that it is common practice for firearm and CDS traffickers to routinely utilize telephones, mobile phones, prepaid phones, text messaging, counter-surveillance, false or fictitious identities, and coded communications to communicate with their customers, suppliers, couriers, and other conspirators for the purpose of insulating themselves from the detection of law enforcement. Moreover, it is not unusual for these subjects to register services such as telephones or vehicle registrations in the name of an associate, a family member, or in the name of a fictitious individual.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other officers and witnesses. This affidavit is intended

to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 922(a)(6) (false statement in the acquisition of a firearm), 18 U.S.C. § 922(g)(3) (unlawful user of narcotics in possession of a firearm), 18 U.S.C. § 932 (straw purchasing of firearms), and 18 U.S.C. § 1001 (false statements) have been committed, are being committed, and will be committed by the individuals known to law enforcement as Jasmin CARATTINI and Darius BELTON, and evidence of these violations are in the property to be searched in Attachment A. There is also probable cause to believe that the information described in Attachment B will constitute evidence of these criminal violations.

## KNOWLEDGE ABOUT FIREARMS TRAFFICKING

7. Based on my training, professional education, and experience, I have learned the following about the distribution of firearms and the methods of operation of individuals involved in illegal firearms trafficking:

    a. Federal Firearm Licensees ("FFL"), which are licensed to deal firearms and are regulated by the ATF, are required to have prospective non-licensed and nonpermitted firearm purchasers complete ATF Form 4473 (Firearms Transaction Record). The FFL also requires photo identification from each purchaser at the time of transfer. The Firearms Transaction Record requires each purchaser to answer basic biographical questions about him/herself as well as questions about prior criminal convictions and/or conduct that may prohibit their possession of firearms. Once that information is communicated to the FFL, the FFL then contacts the Federal Bureau of Investigation (FBI) National Instant Check System (NICS) to see if the prospective buyer is prohibited from purchasing or possessing firearms. If the prospective buyer is not prohibited, the firearm is immediately transferred. If there is a question as to their

prohibited status, the transfer can be delayed for up to three business days. If the person is clearly prohibited, the firearm transaction is immediately denied.

b. Individuals who are prohibited from possessing firearms or who unsuccessfully attempt to acquire firearms through FFLs very often pursue illegitimate channels to acquire firearms. I know that these individuals will sometimes utilize "straw" purchasers to obtain firearms. These "straw" purchasers assist prohibited persons with circumventing existing regulations that prevent them from acquiring firearms legitimately. Often the straw purchasers may themselves be prohibited from possessing or acquiring firearms but are able to circumvent existing laws and/or regulations through a variety of means, to include having a weapons permit, utilizing gun shows, or making misrepresentations on ATF Form 4473 (Firearms Transaction Record) during the acquisition of firearms.

c. Individuals involved in illegal firearms trafficking will often conduct repeated purchases of firearms from different licensed firearm vendors and often will purchase the same make and model of popular firearms.

d. In addition, the traffickers often maintain and have quick access to large amounts of currency or other liquid assets to maintain their business. Increasingly, they transfer cash using electronic devices and applications, such as CashApp, Venmo, and PayPal.

e. Firearms traffickers often use electronic devices to facilitate their illegal conduct. For example, traffickers often maintain telephone numbers and addresses of clients and suppliers and keep those records readily available on electronic devices in order to efficiently conduct their trafficking or illegal distribution business. Firearms traffickers in many instances will "front" (that is, sell on consignment) firearms to their clients and keep records of items paid and owed. Increasingly, such records are electronic and are kept on electronic devices such as cellphones. These individuals will often use cellphones to photograph firearms to be sold or traded, to research firearms and pricing on the internet, to communicate with customers and

suppliers via text messaging and messaging applications, and to conduct actual transactions for firearms. Electronic devices can store information for long periods of time, and data can in some cases be recovered from a device even if it has been deleted by the user.

f. It is common for individuals involved in the unlawful acquisition, possession, or transfer of firearms to attempt to hide their identities and whereabouts, including their current residence address, from law enforcement. Therefore, these individuals go through surreptitious means to acquire, possess, transfer, or sell firearms without complying with federal and state law. These means include listing a post office box, using an address of an acquaintance or relative, or using a previous address as their current residence when completing paperwork required to lawfully purchase a firearm. Additionally, these individuals will often report the firearms stolen shortly after purchase. By doing these actions, these individuals attempt to thwart law enforcement efforts to trace firearms to their initial purchasers after they are recovered in a crime.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

8. The property to be searched is an Apple iPhone 13 with cracked screen and clear case with blue flowers, referred to hereinafter as "the Device." The Device is currently located at the ATF Martinsburg Field Office's evidence vault in Martinsburg, Berkeley County, West Virginia.

9. The applied-for warrant would authorize the forensic examination of the Device, as described in Attachment A, for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

10. On August 22, 2024 at approximately 1048 hours, I received a call from Richalie

Demaine, owner of Green Monstah Firearms, LCC, located at 1514 Winchester Avenue, Martinsburg, West Virginia 25405, advising there was a female in the store in the process of a possible "straw purchase" of a firearm. Ms. Demaine stated Jasmin CARATTINI previously purchased a Taurus model G3 pistol in March 2024 and had just come into the store asking to purchase the same pistol. Ms. Demaine believed the purchase was suspicious and stated there was a possible passenger waiting in CARATTINI's vehicle, a maroon Volkswagen parked in the middle of the parking lot away from the store's front entrance. Ms. Demaine advised CARATTINI's background check had been initiated and no response had yet been received.

11. SA Keith Martin, SA Daniel Divincenzo, and I responded to Green Monstah Firearms. Upon arrival to the area, I received a call from Ms. Demaine, who advised CARATTINI was outside of the business talking on her cellphone. I made contact with CARATTINI, who was talking on her cellphone just outside the front entrance to Green Monstah Firearms, and escorted her to her vehicle, a maroon Volkswagen Passat bearing West Virginia registration 1VY591. No passenger was observed within CARATTINI's vehicle. Agents identified themselves and advised they had responded after being notified of a suspicious purchase.

12. CARATTINI stated she has firearms at home and was currently in the process of purchasing an additional firearm for her protection. When questioned why she was attempting to purchase the same firearm as she purchased in March, CARATTINI advised she likes Taurus G3s. CARATTINI then became agitated, stating she has a myriad of health issues including heart problems and COVID-19. CARATTINI stated she was supposed to be home on oxygen, as her oxygen saturation level was 79; however she showed no apparent signs of having difficulty breathing. I asked CARATTINI why she was currently at a gun shop purchasing a firearm if she needed to be home on oxygen. CARATTINI then stated she has eight (8) bottles of oxygen at

home and was on the phone with her doctor's office to arrange getting more oxygen.

13. CARATTINI offered to take the agents to her residence to show them the other firearms she has purchased, adding the firearms "should" still be there and in their boxes.

14. CARATTINI described how she and her boyfriend, Darius BELTON, were in an altercation on June 27, 2024 and that BELTON put a gun in her face. CARRATTINI stated BELTON is now prohibited from possessing firearms as a result of this incident. CARATTINI stated the firearm BELTON used was one of her two firearms. CARATTINI stated BELTON used to have firearms when they lived in Florida but sold them all when they moved out of state.

15. CARATTINI stated she has no employment and receives "SSI" (Supplemental Security Income) as her source of income.

16. CARATTINI stated she was currently supposed to be taking a young homeless female by the name of Alexis Folks to Hagerstown, Maryland.

17. CARATTINI then admitted the two firearms previously purchased were not at her residence, adding they had been stolen out of her vehicle.

18. CARATTINI opened her vehicle's driver door to get water and a cigarette. The strong odor of marijuana emanated from the vehicle. CARATTINI proceeded to smoke a cigarette, and no apparent issues related to breathing difficulties were observed.

19. CARATTINI stated she was currently buying a Taurus firearm but could not recall the model or caliber. CARATTINI stated her mother gave her $330 to buy the firearm and provided her mother's name as Marlene Carattini and telephone number (646) 833-5708. When agents inquired about contacting her mother to confirm this information, CARATTINI stated her mother didn't know what the money she provided was for.

20. CARATTINI stated the two stolen firearms were a Taurus G3 purchased in March

2024 and a Taurus G2C purchased in 2022. CARATTINI later stated BELTON gave her the money to purchase the Taurus G3 in March 2024 as a Valentine's gift, and BELTON came into Green Monstah Firearms with her to purchase the firearm.

21. CARATTINI stated she placed the firearms in the rear passenger side of her vehicle on Monday, August 19, 2024 for approximately one hour with the vehicle unlocked, and someone stole the firearms during that hour. CARATTINI stated she did not report the firearms stolen with law enforcement. CARATTINI stated the firearms were in a black purse with marijuana in it, and the vehicle was parked on the street in front of her residence at 321 Winchester Avenue, Martinsburg, West Virginia. CARATTINI stated she had taken BELTON to work that morning and came back home to rest. When asked why she didn't report the firearms stolen, CARATTINI stated because she "felt like shit," "couldn't stay awake," and felt like "death." CARATTINI stated she did not tell anyone the firearms had been stolen, even BELTON. When asked why she put the firearms in her vehicle, CARATTINI stated she did not feel comfortable leaving the firearms at home with BELTON following the June incident. I advised CARATTINI her explanation for leaving the firearms in her vehicle didn't make sense, because BELTON was at work. CARATTINI then provided an additional response that didn't make sense and accused me of twisting her words. CARATTINI then stated the side of her face felt numb and that she thought she was having a stroke. CARATTINI also discussed having anxiety issues. No apparent physical problems with CARATTINI were observed. In my training and experience, individuals who "straw purchase" firearms on behalf of others frequently do not report the firearms as stolen, but later claim the firearms have been stolen from their vehicle or residence when contacted by law enforcement.

22. SA Martin, who had stepped aside to call CARATTINI's mother, returned and

reported that Marlene Carattini advised she recently provided her daughter with $200, and believed BELTON was providing CARATTINI money to purchase firearms. Marlene Carattini stated she believed CARATTINI didn't want BELTON to get in trouble because he supports her financially. CARATTINI confirmed that BELTON supports her financially by working full-time and utilizing her Volkswagen driving for a ride share company.

23. CARATTINI stated she has a 2018 arrest for selling narcotics and admitted to formerly selling narcotics including "crack and weed." CARATTINI stated she used "coke" and Percocets from 2017 to 2019 but only uses marijuana now. CARATTINI admitted to using marijuana approximately two times a day, adding that she has been using marijuana since she was twelve (12) years old.

24. CARATTINI admitted to falsely answering "no" to Question 21(f) on the ATF Form 4473, Firearm Transaction Record, regarding marijuana and narcotics usage, which asks, "Are you an unlawful user, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? Warning: The use or possession of marijuana remains unlawful under Federal law regardless of whether it has been legalized or decriminalized for medicinal or recreational purposes in the state where you reside."

25. CARATTINI was advised if she was telling the truth she could provide consent for agents to look through her cellphone and clear up any questions. CARATTINI declined to provide consent to search her cellphone. CARATTINI did not admit to purchasing any firearms on behalf of someone else and stated there would not be anything in her cellphone regarding her purchasing firearms for anyone else, but advised there would be information regarding marijuana. Given her inconsistent statements and incriminating admissions, CARATTINI's cellphone, an Apple iPhone 13 with cracked screen and clear case with blue flowers, was seized.

26. SA Divincenzo obtained copies of the ATF Forms 4473, Firearm Transaction Records, from Green Monstah Firearms for CARATTINI's March 21, 2024 purchase of a Taurus, model G3, 9mm caliber pistol bearing serial number AED262216; and August 22, 2024 attempted purchase of a Taurus, model TH9C, 9mm pistol, bearing serial number AGD176308. CARATTINI checked the box affirming the firearm purchases were for herself, and not on behalf of another individual. CARATTINI also checked "no" to the question regarding being an unlawful user of marijuana.

27. During the interview, agents noted that CARATTINI did not possess a valid driver's license and only had a West Virginia Identification card. Agents advised CARATTINI she would need a licensed driver to drive her vehicle home. CARATTINI stated she would walk home and leave her vehicle until a licensed driver could pick it up for her. I advised CARATTINI that I did not feel comfortable having her walk home if she truly had so many health issues and offered to drive CARATTINI home, followed by SA Martin and SA Divincenzo. Once in my vehicle, CARATTINI stated she has had multiple people from Hagerstown, Maryland ask her to buy gun parts for them, but not actual guns. I stated it is not illegal for anybody to purchase firearm parts. CARATTINI stated she does not have information about illegal firearm purchases or possession; but does have information about individuals that "need to go to jail" and are involved with narcotics and would be willing to meet with agents and go through her cellphone to identify these individuals. CARATTINI inquired about meeting with me the following week to go through her cellphone with me. I provided my cellphone number to CARATTINI, who advised she would call if she recalled any further information.

28. Following the interview, I conducted a query of law enforcement databases and identified a June 26, 2024 arrest of BELTON, who was traffic stopped in Berkeley County, West

Virginia following a domestic dispute with CARATTINI. BELTON was found to be in possession of the Taurus, model G3, 9mm caliber firearm purchased by CARATTINI in March 2024. CARATTINI advised officers that BELTON had stolen the firearm from her during the dispute. CARATTINI stated in her August 22, 2024 interview that BELTON provided her the money for the purchase and was present at Green Monstah Firearms with her during the purchase.

29. An additional firearm related incident regarding BELTON was identified. On August 16, 2022, BELTON was arrested in Berkeley County, West Virginia for pointing a handgun at CARATTINI's sister. Additional information regarding this incident has been requested from local law enforcement.

## THE DEVICE'S LOCATION

30. The Device is currently in the lawful possession of the ATF. I took custody of the Device at the time of CARATTINI's interview on August 22, 2024.

31. I seek this warrant for an examination of the Device, which will comply with the Fourth Amendment and other applicable laws.

32. The Device is currently in storage at the ATF Martinsburg Field Office in Martinsburg West Virginia, which is within the Northern District of West Virginia. In my training and experience, I know that the Device has been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the ATF.

## TECHNICAL TERMS

33. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storingnames and phone numbers in electronic "address books;" sending, receiving, andstoring text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media

      can contain any digital data, including data unrelated to photographs or videos.

c. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer

software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

e. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

34. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the

devices.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

35. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

36. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

37. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

38. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for theCourt to authorize execution of the warrant at any time in the day or night.

39. *Delayed Notice.* I further request pursuant to 18 U.S.C. § 3103a(b)(3) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the

warrant to delay notice until 30 days from the issuance of this warrant as law enforcement is actively investigating CARATTINI, BELTON, and possibly others. Notifying these individuals of this search warrant may alert them and their co-conspirators to the ongoing and continuing investigation into the distribution of controlled substances in the Northern District of West Virginia and elsewhere.

## CONCLUSION

40. In my training and experience, I know that firearms traffickers or people who are prohibited from possessing firearms often use "straw purchasers" to initially purchase firearms from FFLs to conceal their identities within the trafficking process. I know that these firearm sales are brokered utilizing cellular phones to make contact and arrange meeting places for sale or transfer of the firearms after they're purchased by the straw purchaser at the respective FFL.

41. Additionally, I know from my training and experience that a smartphone is used to provide GPS directions native or secondary application to the Device. The location of the Device is often logged during the communication with the cellular network and the satellites and embedded within the Device. I know from my training and experience with cellular phone examinations that persons often utilize GPS based applications to provide directions, even when traveling on foot. I also know that photographic content within the Device often contain metadata which can log GPS coordinates or locational data. I know from training and experience that often times this data will be supported by GPS data within the Device.

42. A physical search of the contents of the Device is only a search analysis of the data contained within the device and not the cellular provider data which would be obtained through a separate legal demand. It is anticipated that GPS location information will be located

in the Device.

43. I respectfully submit this affidavit which supports the same probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

LAUREN SCOLL
Digitally signed by LAUREN SCOLL
Date: 2024.08.28 13:28:59 -04'00'

Lauren Scoll
Special Agent
Bureau of Alcohol, Tobacco, Firearms & Explosives.

Subscribed and sworn to before me on August 28, 2024

_____
UNITED STATES MAGISTRATE JUDGE
ROBERT W. TRUMBLE